UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| DONNIE R. BARRETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 13-CV-3001 |
| | ) | |
| FORREST ASHBY, JAMES | ) | |
| CLAYTON, SALLY HOUGAS, | ) | |
| JOSEPH HANKINS, DALE | ) | |
| KUNKEL, and | ) | |
| EDWINA BIERMANN, | ) | |
| | ) | |
| Defendants. [1] | ) | |
| | ) | |

## OPINION

**SUE E. MYERSCOUGH, U.S. District Judge:**

Plaintiff, proceeding pro se and detained in the Rushville Treatment and Detention Center, pursues the following claims: 1) retaliation for Plaintiff's grievances and freedom of information requests; and, 2) placement in segregation without procedural due process and for no legitimate, non-punitive purpose. (2/20/13 Order.) In particular, Plaintiff claims that he was retaliated against and put in segregation for possessing information obtained by Plaintiff through a Freedom of Information request regarding

---

[1] Plaintiff voluntarily dismissed Defendants Caraway, Groot, Jumper, and Roth. (8/12/14 text order.)

Defendant Clayton's work history and qualifications. The case is now at the summary judgment stage.

After carefully reviewing the evidence, the Court concludes that a rational jury could not find in Plaintiff's favor. Plaintiff does not dispute that one of the reasons for his segregation and discipline was because a spreadsheet of all the residents' names, birth dates, and social security numbers was found in a resident's room on Plaintiff's unit. Plaintiff does not dispute that this resident informed Defendant Clayton that Plaintiff had given the resident the spreadsheet. Therefore, regardless of Plaintiff's protected First Amendment activity, Plaintiff would have been placed in segregation anyway. For the same reason, whether Plaintiff received procedural due process before his placement in segregation is immaterial. A different process would not have produced a different result.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In a § 1983 case, the plaintiff bears the burden of proof on the constitutional deprivation that underlies the claim, and thus

must come forward with sufficient evidence to create genuine issues of material fact to avoid summary judgment." McAllister v. Price, 615 F.3d 877, 881 (7th Cir. 2010). However, at the summary judgment stage, evidence is viewed in the light most favorable to the nonmovant, with material factual disputes resolved in the nonmovant's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists when a reasonable juror could find for the nonmovant. Id.

## FACTS

These facts are set forth in the light most favorable to Plaintiff, as required at this stage.

According to Plaintiff, on October 30, 2012, Defendant Clayton, an investigator at the Rushville Treatment and Detention Center, tried to intimidate Plaintiff by telling Plaintiff that Plaintiff's complaints to various outside agencies would go nowhere because Clayton had worked for the FBI and other law enforcement agencies. The next day, Plaintiff filed a grievance about this incident. In the facility, a grievance is also known as an "attempt to resolve" or "ATR." (10/31/12 grievance, d/e 109-4, p. 3.)

Plaintiff asserts that Investigator Clayton tried to persuade Plaintiff to drop the grievance by showing Plaintiff proof that Clayton had worked for the FBI, but Plaintiff told the grievance officer that he wished to pursue the grievance. On or about November 26, 2012, to confirm Investigator Clayton's purported work history claims, Plaintiff sent out Freedom of Information Requests to the Illinois Department of Human Services, the Illinois State Police, the U.S. Department of Justice, and the Office of the Executive Inspector General. (11/26/12 letter, d/e 109-5, p. 7.)

On December 5, 2012, Investigator Clayton wrote Plaintiff an incident report for making false accusations against Clayton. Clayton wrote :

> Barrett claims that this R/I has informed him that I am a member of the FBI, ISP Investigator, Military Investigator, DHS OIG investigator. These comments in this ATR are completely false. At no time did this R/I tell Barrett that I worked for those agencies. . . .Resident Barrett appears to have extremely delusional thoughts and continues to file fraudulent complaints with numerous agencies. These frivolous complaints by resident Barrett is causing a waste of State employee resources and manpower. Barrett is continually trying to manipulate the DHS/TDF system.

(12/5/12 incident report, d/e 109-4.)

On December 10, 2012, Plaintiff received a notice to appear before the behavior committee on charges of lying to staff/attempted staff manipulation/violation of rules/insolence.  The notice accused Plaintiff of filing false reports "on various dates and various times," specifically singling out Plaintiff's 10/31/12 grievance against Clayton. (12/10/12 notice, d/e 109-4.)

Plaintiff appeared before the behavior committee on December 11, 2012, bringing the information he had received from the Office of Executive Inspector General in response to Plaintiff's FOIA request.  Included in that response was a highly redacted questionnaire completed by Investigator Clayton, which revealed Clayton's high school and post-secondary education, his work experience and employment, training, and other parts of his curriculum vitae.  (109-5, pp. 5-19.)  The behavior committee gave Plaintiff a warning for lying, noting in their decision that Plaintiff appeared to "truly believe" that Investigator Clayton had been deceptive about Clayton's work history.

Hours after showing the behavior committee the FOIA documents, Plaintiff's room was searched by Defendants Clayton and Hougas, among others. The FOIA information about Investigator Clayton was confiscated. Clayton avers that officers also found the name, date of birth, personal address, and license number of a staff member, but Plaintiff disputes this. Plaintiff asserts that he did not possess the staff information and was not interviewed by Clayton about that information on December 11, 2012. (Pl.'s Dec. paras. 26, 27, 30, d/e 109-1.) Plaintiff also asserts that he had only five copies of the FOIA information, not thirteen as Clayton states, and that he intended to send those copies to outside agencies, not to distribute amongst other residents, as Clayton asserts.

Investigator Clayton avers that he perceived the FOIA information to contain personal information about him and believes that dissemination of that personal information posed a safety threat. (Clayton Aff. paras. 5, 6, 8.) Clayton instructed officers to search other rooms near Plaintiff's room to determine whether the FOIA information had been distributed. Facility rules prohibit the "verbal or written

disclosure of <u>any</u> personal information about a staff member with another resident, any staff member, or visitor." (8/23/01 Memo, d/e 109-8, p. 16)(emphasis in original).

Plaintiff does not dispute Clayton's averment that, during the search of another resident's room on Plaintiff's unit on December 11, 2012, "staff found a spreadsheet that contained all of the TDF residents with their date of birth and social security numbers. Another resident stated that he had received this spreadsheet from resident Barrett." (Defs.' Undisputed Fact 6, Clayton Aff. para. 6.) Instead, Plaintiff maintains that "[i]t is beyond the scope and irrelevant as to what another resident allegedly had in his possession and whether the alleged information came from me." (Pl.'s Resp. para. 6, d/e 109, p. 5.) Clayton avers that Plaintiff admitted giving the spreadsheet to the resident, another contention that Plaintiff does not dispute but argues is "irrelevant." (Pl.'s Resp. p. 5, para. 7., d/e 109.) Plaintiff does assert that he was not in *possession* of this information when it was found, (Pl.'s Dec. para. 50), but that falls short of swearing, under penalty of criminal perjury, that Plaintiff had never possessed

the information and had not given the information to another resident.  In any event, even if Plaintiff averred that he never had or distributed the spreadsheet, Plaintiff does not dispute Defendant Clayton's averment that Clayton relied on what the resident told Clayton about the spreadsheet.

Plaintiff was placed in "temporary special management status" on December 11 or 12, 2012, pending review by the behavior committee.  Temporary special management meant that Plaintiff was generally prohibited from leaving his room without permission.  (Hankin Aff. para. 8.)

On December 14, 2012, the behavior committee met and reviewed another incident report by Investigator Clayton. Defendant Hankins was one of three members on the committee (the other two have been voluntarily dismissed). Plaintiff did not receive a copy of the incident report, which recounted the materials found during the searches on December 11, 2012, including the spreadsheet.  (Incident report, d/e 96-12, p. 1, undated and unsigned.)  A notice of violation was drafted at some point, but the notice did not

specify a charge or the facts of which Plaintiff was accused. (notice, 96-9, p. 1, undated and unsigned.)

At a meeting on December 14, 2012, the behavior committee decided that Plaintiff should be placed on "special management/investigative status." (Hankins Aff. para. 17.) "Special status" is for residents who are perceived as a danger or face criminal charges. (Hankins Aff. para. 8.) According to Plaintiff, he was not present at this meeting because he was not taken to the meeting. (Pl.'s Dep. p. 16.) On special status, an inmate is moved to a different room on a different wing, without his property. When Plaintiff was initially placed on special status, he was confined by himself without his property; one hour per day he was allowed to sit and watch television in the infirmary. (Pl.'s Dep. 19.)

Plaintiff appeared before the behavior committee on December 18, 2014, and the committee decided to continue Plaintiff' special status pending the investigation. On December 20, 2012, Plaintiff appeared before the committee again, who again decided to keep Plaintiff on special status "pending further investigation & possible criminal charges . .

.", but permitted Plaintiff to have "regular dayroom and shower offerings." (12/20/12 review, 96-8, p. 1.) After the December 20th meeting, Plaintiff was permitted in the dayroom for one hour in the morning and one hour in the afternoon, but Plaintiff had to wear handcuffs. (Pl.'s dep. pp. 20-21.)

On January 2, 2012, Plaintiff appeared before the committee on a charge of "unauthorized property." Without explanation, the committee found Plaintiff guilty of unauthorized property and imposed "close status" of 30 days on Plaintiff. (d/e 109-6, p. 15.) On close status, a resident is permitted to come out to the day room for three hours per day total: one hour in the morning, afternoon, and evening. (Hankins Aff. para. 21.) Showers are permitted every day, as well as purchases from the commissary, one-hour visits in the visiting room, the ability to make outgoing calls, and a three-day change of clothing. (Hankins Aff. para. 23.)

## ANALYSIS

Plaintiff may exercise his First Amendment rights to the extent consistent with the facility's legitimate concerns, including safety and security concerns. *See* Turner v. Safely, 482 U.S. 78, 89

(1987)(setting forth legal standard for analyzing First Amendment claims by prisoners).

Plaintiff argues that he had an unfettered First Amendment right to possess the FOIA documents, which he had obtained through legal means. That is not entirely accurate. Plaintiff retains only those First Amendment rights that are consistent with the security and safety of the staff and residents at Rushville. Documents that Plaintiff may possess while free may be prohibited in the detention setting, provided that a legitimate government interest supports that restriction. Certainly the facility can protect its employees and residents from harassment, intimidation, and the dissemination of personal information that might pose a risk to safety.

However, the Court does not need to decide if Plaintiff had a protected First Amendment right to possess and use these particular FOIA documents. Even assuming that Plaintiff had that right, Plaintiff's retaliation claim still fails because Plaintiff's segregation pending investigation was justified by the discovery of the spreadsheet. Possessing and distributing a spreadsheet with residents' birth dates and social security numbers is not a protected First Amendment right. Even if Defendant Clayton was motivated

in part by Plaintiff's grievances and FOIA requests, Plaintiff would have been placed in segregation and punished anyway, based on Plaintiff's distribution of the spreadsheet. Gomez v. Randle, 680 F.3d 859, 866 (7th Cir. 2012)(if a prima facie retaliation case is shown and the defendants show that the adverse action would have occurred anyway, then the plaintiff must show the government's reason for the adverse action is pretextual). The dissemination of the spreadsheet is far from irrelevant, as Plaintiff argues.

Nor does Plaintiff have a retaliation claim based on Clayton's disciplinary report charging Plaintiff with making false statements. Even if Clayton was motivated by retaliation for Plaintiff's exercise of his First Amendment rights, the disciplinary report itself was not objectively serious enough to deter Plaintiff from exercising his First Amendment rights. Gomez, 680 F.3d at 866 (plaintiff must show that he suffered a deprivation that would likely deter First Amendment activity in the future). Plaintiff's only deprivation caused by this disciplinary report was having to appear before the behavior committee and receiving a warning. Plaintiff was not deterred in any way from exercising his First Amendment rights; he continued to file grievances about Clayton and others.

Remaining is Plaintiff's procedural due process claim based on his placement in segregation from December 14, 2012, to January 2, 2013. Placement in segregation for a few days in order to investigate does not generally trigger due process protections, but here the segregation lasted about three weeks. Plaintiff was entitled to adequate notice of the charges and the facts underlying those charges and a meaningful opportunity to present a defense. *See* Higgs v. Carver, 286 F.3d 437 (7th Cir. 2002)(citations omitted). Defendants do not contend that Plaintiff received this process, nor does the record show that he did.

However, like the retaliation claim, Plaintiff must have evidence that procedural due process protections might have made a difference to the outcome. *See* Jones v. Cross, 637 F.3d 841, 846-47 (7th Cir. 2011)(delay in prison disciplinary hearing harmless where no prejudice suffered)*;* Piggie v. Cotton, 344 F.3d 674, 678 (7th Cir. 2003)(applying harmless error analysis to refusal to call witnesses in prison disciplinary hearings). Plaintiff does not dispute that he gave the spreadsheet to another resident. Plaintiff's segregation pending a further investigation would have occurred regardless of the procedural due process protections afforded to

Plaintiff. As to Plaintiff's punishment of "close status" for 30 days after January 2, 2013, the restrictions on close status were not severe enough to trigger procedural due process protections. Miller v. Dobier, 634 F.3d 412 (7th Cir. 2011)(imposition of "close" status at the Rushville Treatment and Detention Center did not trigger procedural due process protections).

**IT IS THEREFORE ORDERED:**

1. Plaintiff's motion for an order directing the facility to return to him Plaintiff's declaration, which was purportedly confiscated in a shakedown is denied (120). **However, the clerk is directed to send Plaintiff a copy of the declaration Plaintiff filed in this case (109-1, pp. 1-25.)**

2. Plaintiff's motion for the Court to try to recruit pro bono counsel is denied (116.) Plaintiff's filings in this case demonstrate that he has a clear grasp of the facts relevant to his claim and is knowledgeable about the law and legal procedure. He has been able to obtain relevant information in discovery, and he has significant experience litigating in federal court. Additionally, his claims are relatively simple, involving events of which he has personal knowledge. On this

record, Plaintiff appears competent to proceed pro se in light of the straightforward nature of his claims. <u>Pruitt v. Mote</u>, 503 F.3d 647, 654-55 (7th Cir. 2007).

3. Defendants' motion for summary judgment is granted (d/e 95).

4. The clerk of the court is directed to enter judgment in favor of Defendants and against Plaintiff. All pending motions are denied as moot, and this case is terminated, with the parties to bear their own costs. All deadlines and settings on the Court's calendar are vacated.

5. If Plaintiff wishes to appeal this judgment, he must file a notice of appeal with this Court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal in forma pauperis should identify the issues Plaintiff will present on appeal. See Fed. R. App. P. 24(a)(1)(c).

ENTER: March 2, 2015

FOR THE COURT:

                         **s/Sue E. Myerscough**
                          SUE E. MYERSCOUGH
              UNITED STATES DISTRICT JUDGE